IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

Appeal No.  21-13123-D
_____

UNITED STATES,

Appellee

v.

CHRISTOPHER DEFILIPPIS,

Appellant

---

A DIRECT APPEAL OF A CRIMINAL CASE
FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
DISTRICT COURT CASE 8:20-cr-00342-SCB-TGW

---

INITIAL BRIEF OF APPELLANT
_____

ANNE F. BORGHETTI, ESQ.
12211 49th St. N., Ste 1
Clearwater, FL 33762-4300
Florida Bar # 0843385
Telephone:  727-502-0300
Facsimile:  727-502-0303
E-Mail: Anne@BorghettiLaw.com
CJA Counsel for Appellant

No. 21-13123-D

*United States v. Defilippis*

<u>CERTIFICATE OF INTERESTED PERSONS</u>

In compliance with Federal Rule of Appellate Procedure 26.1 and 11th Circuit Rule 26.11, the undersigned hereby certifies that the following listed persons and entities have an interest in the outcome of this particular case:

1.   Borghetti, Anne F., Counsel for Appellant;

2.   Bucklew, Hon. Susan C., United States District Judge;

3.   Defilippis, Appellant

4.   Dinsbier, Adam, R., former Counsel for Appellant;

5.   Gershow, Holly Lynn, Counsel for Appellee;

6.   Hall, Alex Fitzgerald, Federal Public Defender;

7.   Handberg, Roger B., United States Attorney;

8.   Hoppmann, Karin, former Acting United States Attorney;

9.   Howard Katherine G., Former Counsel for Appellant;

10.  Kahn, Conrad, former Counsel for Appellant;

11.  Lopez, Maria Chappa, Former United States Attorney;

12.  Michael P. Maddox, former Counsel for Appellant;

13.  Novaes, Diego Fontes, Assistant United States Attorney;

14.     Rhodes, David P., Assistant United States Attorney, Chief, Appellate Division;

15.     Ruddy, Joseph, Assistant United States Attorney;

16.     Sansone, Amanda A., United States Magistrate Judge;

17.     Sneed, Julie S., United States Magistrate Judge

18.     Wildon, Hon. Thomas G., United States Magistrate Judge.

No publicly traded company or corporation has an interest in the outcome of this appeal.

## STATEMENT REGARDING ORAL ARGUMENT

Appellant Christopher Defilippis respectfully requests oral argument. Counsel believes oral argument will be beneficial to the Court in its resolution of the issues presented herein, particularly given the volume of the record from the lower court and the complexity of the issues raised on appeal.

# TABLE OF CONTENTS

**Page**

Certificate of Interested Persons ........................................................... C1

Statement Regarding Oral Argument ..................................................... i

Table of Contents ................................................................................ ii

Table of Citations ................................................................................. v

Statement of Jurisdiction ..................................................................... ..1

Statement of the Issues ......................................................................... 2

Statement of the Case ............................................................................ 3

i)    Course of Proceedings and Disposition in the Court Below .......................... 3

      A.    Pertinent Pretrial Filings and Proceedings ........................................... 3

      B.    The Trial ................................................................................... 5

      C.    The Motion for New Trial and the Expert Testimony at Issue ............ 8

      D.    Sentencing ................................................................................ 14

ii)   Statement of the Facts .................................................................... 14

iii)  Standards of Review ...................................................................... 19

Summary of the Argument .................................................................... 21

Arguments and Citations of Authority ................................................... 23

I.    THE  DISTRICT  COURT  ERRED  IN  DENYING  MR.
      DEFILIPPIS' MOTION FOR A NEW TRIAL BASED ON THE
      GOVERNMENT'S  FAILURE  TO  TIMELY  DISCLOSE
      CRITICAL MATERIAL EVIDENCE ........................................... 23

A. The Government's Discovery Violations...................................................23

B. The Discovery Violations Violated Mr. Defilippis' Substantial
Rights........................................................................................................28

II.  THE DISTRICT COURT ERRED IN DENYING MR.
DEFILIPPIS' MOTION FOR A JUDGMENT OF ACQUITTAL
BECAUSE THE GOVERNMENT PRESENTED INSUFFICIENT
EVIDENCE TO PROVE THE BUT-FOR CAUSATION
ELEMENT OF COUNT ONE .................................................................32

III. THE COLLATERAL EVIDENCE LISTED IN THE
GOVERNMENT'S RULE 404 NOTICE WAS IRRELEVANT TO
THE ELEMENTS AT ISSUE AT TRIAL AND WAS UNDULY
PREJUDICIAL TO THE APPELLANT ........................................................36

A. The Collateral Evidence was Inadmissible Under Rule 404(b)..............36

B. The Error in Admitting the Collateral Crimes Evidence was not
Harmless ...................................................................................................39

IV. THE DISTRICT COURT ERRED IN ADMITTING THE
PHOTOGRAPHS THAT SHOWED MR. DEFILIPPIS IN AN
ORANGE JAIL JUMPSUIT ........................................................................40

V.  THE DISTRICT COURT ERRED IN SENTENCING MR.
DEFILIPPIS UNDER THE ENHANCED SENTENCING
PROVISIONS OF 21 U.S.C. §§ 841(b)(1)(C) and 851 BASED ON
HAVING SUSTAINED PRIOR CONVICTIONS FOR A
"FELONY DRUG OFFENSE" ......................................................................42

A. "Felony Drug Offenses" and "Serious Drug Felonies"............................42

B. The First Step Act Substantially Revised the Mandatory
Minimum Sentencing Provisions of 21 U.S.C. § 841 ..............................45

1. The Imposition of the Mandatory Life Sentence under Subsection 841(b)(1)(C) was an Absurd Result that was Contrary to Legislative Intent .................................................................................45

2. The Imposition of the Mandatory Life Sentence under Subsection 841(b)(1)(C) Also Violates the Fifth Amendment Because it Results from an Arbitrary Sentencing Scheme with no Rational Basis ...............................................................................49

Conclusion .................................................................................50

Certificate of Compliance with Rule 32(a).............................51

Certificate of Service .............................................................52

# TABLE OF CITATIONS

**Cases**                                                                                    **Page**

*Berger v. United States*,
    295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935)............................................25

*Brady v. Maryland*,
    373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)...................... 19, 23-26, 30

*Burrage v. United States*,
    571 U.S. 204, 134 S.Ct. 881, 187 L.Ed.2d 715 (2014).............................. 33-34

*Chapman v United States*,
    500 U.S. 453, 467 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991)...........................49

*Chickasaw Nation v. United States*,
    534 U.S. 84, 122 S.Ct. 528, 151 L.Ed.2d 474 (2001)................................ 46-47

*Crooks v. Harrelson*,
    282 U.S. 55, 51 S.Ct. 49, 75 L.Ed. 156 (1930).................................................47

*Dep't of Homeland Sec. v. MacLean*,
    574 U.S. 383, 135 S.Ct. 913, 190 L.Ed.2d 771 (2015)...................................46

*F.S. Royer Guano Co. v. Virginia*,
    253 U.S. 412, 40 S.Ct. 560, 64 L.Ed. 989 (1920)............................................49

*Green v. Bock Laundry Machine Co.*,
    490 U.S. 504, 109 S.Ct. 1981, 104 L.Ed.2d 557 (1989)..................................47

*Johnson v. Robinson*,
    415 U.S. 361, 94 S.Ct. 1160, 39 L.Ed.2d 389 (1974)......................................49

*Kyles v. Whitley*,
    514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995)............................ 25-26

*McDuffie v. State*, 970 So. 2d 312 (Fla. 2007).......................................................41

**Cases (Cont.)**                                                                                        **Page**

*Mooney v. Holohan*,
    294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935)............................................23

*Napue v. Illinois*,
    360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959)......................................24

*Smith v. Sec'y Dep't of Corrs.*, 572 F.3d 1327 (11th Cir. 2009) ..........................24

*Taylor v. State*, 855 So. 2d 1 (Fla. 2003) ................................................................41

*United States v. Anderson*, 289 F.3d 1321 (11th Cir. 2002)..................................33

*United States v. Bagley*,
    473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)....................................25

*United States v. Baker*, 432 F.3d 1189 (11th Cir. 2005) ......................................39

*United States v. Barroso*, 719 Fed.Appx. 936 (11th Cir. 2018) ................ 19, 24-25

*United States v. Beechum*, 582 F.2d 898 (5th Cir. 1978) ......................................37

*United States v. Benjamin*, 958 F.3d 1124 (11th Cir. 2020)..................................33

*United States v. Cancelliere*, 69 F.3d 1116 (11th Cir. 1995) ................................37

*United States v. Chastain*, 198 F.3d 1338 (11th Cir. 1999)..................................27

*United States v. Dupree*, 57 F.4th 1269 (11th Cir. 2023)......................................46

*United States v. Duran*,  596 F.3d 1283 (11th Cir. 2010)................................. 36-37

*United States v. Esquenazi*, 752 F.3d 912 (11th Cir. 2014)..................................25

*United States v. Euceda-Hernandez*, 768 F.2d 1307 (11th Cir. 1985).................19

*United States v. Feldman*, 936 F.3d 1288 (11th Cir. 2019)...................................33

**Cases (Cont.)**                                                                                                  **Page**

*United States v. Fortenberry*, 971 F.2d 717 (11th Cir. 1992) ..............................20

*United States v. Jernigan*, 341 F.3d 1273 (11th Cir. 2003)...................................37

*United States v. Manriquez*, 713 Fed.Appx. 885 (11th Cir. 2017).................. 26-27

*United States v. McCrimmon*, 362 F.3d 725 (11th Cir. 2004)...............................19

*United States v. McLean*, 138 F.3d 1398 (11th Cir. 1998)....................................20

*United States v. Meros*, 866 F.2d 1304 (11th Cir. 1989).......................................26

*United States v. Naranjo*, 634 F.3d 1198 (11th Cir. 2011)....................................24

*United States v. Nerey*, 877 F.3d 956 (11th Cir. 2017) .........................................37

*United States v. Perez*, 443 F.3d 772 (11th Cir. 2006).........................................37

*United States v. Vallejo*, 297 F.3d 1154 (11th Cir. 2002) ....................................26

*United States v. Rivera*, 944 F.2d 1563 (11th Cir. 1991) .....................................27

*United States v. Ryan*, 284 U.S. 167, 52 S.Ct. 65, 76 L.Ed. 224 (1931) ..............47

*United States v. Weiler*, 652 Fed.Appx. 913 (11th Cir. 2016)..............................39

*Univ. of Tex. Sw. Med. Ctr. v. Nassar*,
   570 U.S. 338, 133 S.Ct. 2517, 186 L.Ed.2d 503 (2013)...................................33

# TABLE OF CITATIONS, Continued

**Statutes and Rules**                                                                                          **Page**

18 U.S.C. § 924.................................................................................................43

18 U.S.C. § 3231 ..............................................................................................1

21 U.S.C. § 802 ......................................................................................... 43-44

21 U.S.C. § 841 .............................................................. 2-3, 20, 22, 32-33, 42-49

21 U.S.C. § 851 ......................................................................... 2-3, 14, 20, 42

28 U.S.C. § 1291 ...............................................................................................1

11th Cir. R. 26-11 .........................................................................................C1

11th Cir. R. 28-1 ...........................................................................................51

Federal Rule of Appellate Procedure 26.1 ...........................................................C1

Federal Rule of Appellate Procedure 32.................................................................51

Federal Rule of Criminal Procedure 16 ..................................................... 3, 26-27

Federal Rule of Evidence 403 .................................................................. 37, 39-41

Federal Rule of Evidence 404..............................................................4-5, 18, 36-39

First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194.................... 45, 47-48

Fla. Stat. § 893.13 ...........................................................................................44

## STATEMENT OF JURISDICTION

Under 28 U.S.C. § 1291, the courts of appeal have jurisdiction from all final decisions of the district courts of the United States, except where a direct review may be had in the Supreme Court of the United States.

The United States District Court, Middle District of Florida, Tampa Division, had jurisdiction pursuant to 18 U.S.C. § 3231. The district court entered its judgment and commitment order on September 8, 2021. (Doc. 103.) Appellant Defilippis filed a timely notice of appeal on September 10, 2021. (Doc. 106.)

# **STATEMENT OF THE ISSUES**

I.      Whether the Government's untimely disclosure of evidence that was presented at trial from two expert witnesses violated the Appellant's substantial rights?

II.     Whether the Government presented sufficient evidence to prove the but-for causation element of a charge of distributing a controlled substance that resulted in death?

III.    Whether the district court erred in denying the Appellant's motion in limine to preclude evidence of other alleged crimes and drug-related activity that was purported to have been carried out by the Appellant?

IV.     Whether the district court erred in permitting the Government to introduce at trial photographs that showed the Appellant dressed in an orange jail uniform jumpsuit?

V.      Whether the district court erred in sentencing the Appellant to a mandatory life sentence under the enhanced sentencing provisions set forth in 21 U.S.C. §§ 841(b)(1)(C) and 851 based on the Appellant's prior Florida convictions for Possession and Purchase of Controlled Substances?

## STATEMENT OF THE CASE

**(i)    Course of Proceedings and Disposition in the Court Below**

Appellant Christopher Defilippis was charged in an Indictment on November 17, 2020 in the United States District Court for the Middle District of Florida, Tampa Division, with one count of distribution of a controlled substance containing heroin and fentanyl resulting in death pursuant to 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) (Count One) and one count of possession of fentanyl with intent to distribute pursuant to 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) (Count Two). (Doc. 1.) The charges stemmed from the death of an individual who was found in his home next to a syringe, deceased as a result of fentanyl intoxication. (Doc. 1; 120 at 59.)  The Government alleged that Mr. Defilippis had purportedly supplied controlled substances to the decedent on the day prior.

### A. Pertinent Pretrial Filings and Proceedings

On November 25, 2020, the day after Mr. Defilippis' first appearance, the court entered a pretrial discovery order. (Doc. 15.)  The order called for the Government to comply with most of its Federal Rule of Criminal Procedure 16 discovery obligations by December 14, 2020 or within 15 days after service of the request for discovery. (Doc. 15.)

Prior to trial, the Government filed a notice of prior conviction pursuant to 21 U.S.C. § 851, asserting that Mr. Defilippis had previously been convicted of Florida

offenses of Possession of Controlled Substances and Purchase of a Controlled Substance. (Doc. 54.)

It also filed a notice of intent to present evidence under Federal Rule of Evidence 404(b) to present evidence of other crimes, wrongs or acts of the Defendant. (Doc. 51.) The notice sought to introduce evidence that Mr. Defilippis allegedly sold controlled substances to the decedent and to other individuals on prior occasions in the weeks leading up to the decedent's death. (Doc. 51.) The notice specifically sought to introduce at trial:

> a. Evidence that throughout late March 2020, and April 2020, prior to the overdose death that occurred on April 18, 2020, Defilippis sold the decedent, J.R., narcotics…
>
> b. Evidence that on or about April 11, 2021, a week prior to the fatal overdose in this case, Christopher Defilippis sold narcotics to the decedent in this case, J.R. and A.F. Exactly like the transaction in this case, Defilippis drove his marron Honda Civic, and conducted the hand to hand transaction in a parking lot in Valrico, Florida. The narcotics sold by Defilippis was strong, and it caused A.F. to overdose. A.F. was rushed to the hospital from a residence in Valrico, and survived.
>
> c. Evidence that throughout March 2020, and April 2020, prior to the overdose death that occurred on April 18, 2020, Defilippis sold narcotics to others...

(Doc. 51 at 1-2.) Mr. Defilippis filed a motion in limine to exclude such evidence. (Doc. 63.) The motion set out that much of the evidence the Government sought to admit was taken from Facebook communications found in a phone connected to Mr. Defilippis. (Doc. 63.) The lower court orally denied that motion during the course

of the trial. (Doc. 73; 116 at 225-26.)  It held that the proposed Rule 404(b) evidence was relevant to showing knowledge and intent to distribute. (Doc. 116 at 225-26.) It also held that the probative value outweighed the prejudice to Mr. Defilippis. (Doc. 116 at 226.)

At a May 19, 2021 status hearing, shortly before the trial was scheduled to begin, Mr. Defilippis' counsel informed the court that he had requested, and the Government had agreed to provide, information concerning drug testing the Florida Department of Law Enforcement ("FDLE") had performed in connection with the case, to include the any analysts' bench notes. (Doc. 149 at 4.)  In light of that information still being provided, along with other potential reasons, the court indicated that it would continue the trial if Mr. Defilippis were to waive his right to a speedy trial. (Doc. 149 at 7-10.)  Mr. Defilippis opted to proceed to trial.

## B. The Trial

The jury trial began before the Honorable Susan C. Bucklew on June 1, 2021. (Doc. 114.)  The Government called as witnesses the decedent's girlfriend, various law enforcement witnesses, and various experts as discussed in greater detail below.

During the lead detective's testimony at trial, the Government moved to admit photographs taken at the time of Mr. Defilippis' arrest to depict tattoos on Mr. Defilippis' arms. (Doc. 87-55; 87-56; 87-57; 118 at 108.)  Mr. Defilippis objected, asserting that the photographs were unduly prejudicial because they showed him

wearing an orange jumpsuit that would customarily be worn by an incarcerated person. (Doc. 118 at 108-09.) Mr. Defilippis' counsel proposed that Mr. Defilippis would show the jury his arm tattoos in lieu of the prejudicial photographs being admitted. (Doc. 118 at 109.) The district court overruled the objection, stating:

> THE COURT: Okay. They can take these back. They can't take his arm back, and it will be difficult for him to walk around to show them, which is what he would have to do. I can see the lanyard, but I would not just automatically draw from that that he's in a jail uniform, because I can only see the top part of this body, looks like a T-shirt, if anything. So I'm going to overrule the objection. I don't think it's more prejudicial than probative.

(Doc. 118 at 110.)

The lead detective also alleged that he had field tested the syringe that was found next to the decedent and did not find the presence of any substances on or in the syringe. (Doc. 118 at 174.) The medical examiner's chief toxicologist had testified, nonetheless, that the medical examiner's office had the ability to perform a methanol wash test on a syringe to determine the presence of substances even if substances were not otherwise apparent. (Doc. 118 at 253-54.) The medical examiner's office has not, however, been provided with a syringe to test. (Doc. 118 at 254.)

The medical examiner later testified that the decedent's cause of death was fentanyl intoxication. (Doc. 120 at 59.) In addition to the medical examiner, the

Government further presented the testimony from two toxicologists as discussed in greater detail below. (Doc. 118 at 196-265; 120 at 5-77.)

At the close of the Government's case, Mr. Defilippis moved for a judgment of acquittal on all counts, asserting that the evidence was insufficient to sustain convictions on either of the charges. (Doc. 120 at 85-90.) Mr. Defilippis specifically asserted that the Government had not connected the drugs that he purportedly sold to the victim to the drugs that that the victim fatally injected. (Doc. 120 at 86.) In support of that argument, Mr. Defilippis pointed out that the Government presented no evidence that the syringe that the victim used was tested to determine what substances had been present therein. (Doc. 120 at 86.) The court denied the motion. (Doc. 120 at 96-98.) It reasoned as part of its analysis that there was "an overwhelming amount of circumstantial evidence for this jury to be able to conclude beyond a reasonable doubt that he not only intentionally distributed the controlled substance, the heroin or fentanyl, he knew it was a controlled substance, but also that that controlled substance that he distributed to J.R. was the cause of J.R.'s death." (Doc. 120 at 98.)

In the defense case, Mr. Defilippis called a Florida Department of Law Enforcement laboratory analyst, William Kim, and then testified himself. (Doc. 120 at 101-225.) At the close of the evidence, he renewed his motion for judgment of

acquittal. (Doc. 120 at 227.)  The court again denied the motion. (Doc. 120 at 228-

29.)  In denying the motion, the court stated:

> All right. As to Count 2, I'll deny the motion, finding that there has been sufficient evidence to go to the jury as to whether the Defendant possessed the drugs that were found in his fanny pack, which he's now admitted was his, were for distribution, possession with the intent to distribute.
>
> As to Count 1, I think the issue there, the distribution no longer seems to be an issue, but, at any rate, as to whether -- and you can distribute without -- without offering anything of value. But at any rate, I'm going to deny the motion, and it should go to the jury. The jury may conclude that -- that Mr. Defilippis didn't give him the drugs, and I think that's really the issue in the case, as to whether Mr. Defilippis distributed the drugs as well as perhaps whether the drugs that Mr. Defilippis distributed were the cause of his death.

(Doc. 120 at 228-29.)

The jury went on to find Mr. Defilippis guilty as charged on both counts on

June 7, 2021. (Doc. 86.)

> C. <u>The Motion for New Trial and the Expert Testimony at Issue</u>

Following trial, on June 21, 2021, Mr. Defilippis filed a motion for a new trial,

asserting four grounds for relief:

> (a) The trial court erred in denying DeFilippis' motion in limine to exclude evidence of uncharged, alleged drug transactions and they became a feature of the government's case;
>
> (b) The Government failed to meet its burden of proof and there was insufficient evidence linking the contents of the syringe that allegedly contained fentanyl which caused the death of J.R. to fentanyl found to be distributed by Defilippis;

(c) Statements by the Government during its closing argument on rebuttal did not accurately portray the scientific evidence.

(d) The Government's failure to provide timely disclosure of reports from Government witnesses and failure to disclose important information by Government witnesses.

(Doc. 92 at 2.)

### i. Toxicologist Julia Pearson

With respect to the untimely disclosure issue, Mr. Defilippis recounted that the medical examiner's chief toxicologist, Dr. Julia Pearson, performed testing on a) green tablets found at the time of Mr. DeFilippis's arrest, b) green tablets found at the decedent's residence, and c) foil packets found near the decedent's body. (Doc 92 at 9.) The motion for new trial set out that those items were provided to the Hillsborough County Medical Examiner's Office on June 10, 2020 and that Dr. Pearson authored a report dated November 6, 2020 documenting the testing she performed. (Doc 92 at 9.) Dr. Pearson determined the foil packets contained 4-ANPP, fentanyl, and quinine. (Doc. 118 at 212-14.)

On or about May 27, 2021, four days prior to the start of the trial, counsel for Mr. DeFilippis received a copy of an additional report authored by Dr. Pearson on May 25, 2021, documenting additional testing that she performed. (Doc 92 at 9.) That testing was performed on three additional items: (1) a sealed plastic bag containing one tied bag corner containing unknown white powder; (2) one sealed bag containing one Ziploc bag containing unknown white powder; and (3) one

Ziploc bag containing one sealed plastic bag containing one heat-sealed bag containing 3 Ziploc bags with unknown powder (A, B, and C). (Doc. 88-3 at 2; (Doc 92 at 9.) The Medical Examiner's Office received those three items on May 14, 2021. (Doc 92 at 9.)

The items indicated in Dr. Pearson's May 25, 2021 report had previously been tested at the Florida Department of Law Enforcement (FDLE) by analyst William Kim on or about July 14, 2020. (Doc. 88-5; 92 at 10.) The Laboratory Report authored by Kim identified the substance in Ziploc bag A as fentanyl only. (Doc 92 at 10.) In comparison, Dr. Pearson's Toxicology Report identified the substances in Ziploc A as 4-ANPP, fentanyl, and quinine; the substances in Ziploc B as caffeine, lidocaine, tramadol, 4-ANPP, fentanyl, and quinine; and the substances in Ziploc C as 4-ANPP, fentanyl, and quinine. (Doc 92 at 10.) Pearson testified to those findings at trial. (Doc. 118 at 212-65.) She also testified at trial to the ratios of those various substances in the mixture and alleged that she had never seen such ratios prior to this case. (Doc. 118 at 222-233, 263.) Pearson's report, however, failed to disclose her comparative analysis that the qualitative peak reports generated by gas chromatography and mass spectrometry analysis (GCMS) had shown such rations. (Doc 92 at 10.) The report also failed to state that Pearson had purportedly never previously seen in the ratios she saw in the instant case. (Doc 92 at 10.)

Dr. Pearson additionally testified at trial that, after performing her testing, she had gone back due to "intellectual curiosity" and performed a library analysis of the decedent's blood to see if it contained any quinine. (Doc. 118 at 258.) In that undocumented analysis, she determined there was a trace amount of quinine in the blood. (Doc. 118 at 252-58.) The motion for a new trial set out that Dr. Pearson's additional analyses of the decedent's blood was never stated in her written report. (Doc 92 at 10.) The medical examiner's associate toxicologist testified, on the other hand, that he did not find any quinine in the decedent's heart blood. (Doc. 120 at 16.) The associate toxicologist also found no 4-ANPP in the decedent's blood. (Doc. 120 at 16.)

The motion for new trial set out that the evidence of Dr. Pearson's additional testing caused substantial prejudice to Mr. Defilippis because the foil packets found near the decedent contained the same three substances allegedly contained in Ziplocs A and C, which were found on DeFilippis when he was arrested. (Doc 92 at 9-10.) Mr. Defilippis set out that the late disclosure of that information left him with only four days to prepare for that critical evidence. (Doc 92 at 9-10.) The motion additionally asserted that Dr. Pearson's undisclosed revelations at trial concerning her testing of the decedent's blood further prejudiced Mr. Defilippis because it connected one of the innate substances found in that testing to the decedent's blood, which no other evidence had done. (Doc 92 at 9-10.)

## ii. FDLE Analyst William Kim

In addition to raising the issue of the late disclosure of Dr. Pearson's testing results, the motion for new trial also set out that the Government had failed to disclose to Mr. Defilippis the fact that FDLE analyst William Kim had performed testing on a cotton ball/swab that was located next to the syringe the decedent had used. (Doc. 120 at 123.)  As set forth above, Kim was a listed Government witness, but was called to testify at trial by Mr. DeFilippis.  During cross examination, the Government elicited testimony from Kim that, in addition to the Ziploc baggies, he had also been provided with and performed testing on a swab/cotton ball connected to the instant case. (Doc. 120 at 123-24.)  The Government had not, however, disclosed that information to Mr. DeFilippis. (Doc. 120 at 123-24.)  When the Government elicited that testimony, Mr. Defilippis' objected based on the fact that he had not been provided with information concerning the testing of that swab. (Doc. 120 at 123-24.)  The district court overruled the objection, noting that the Defense had called Kim as a witness. (Doc. 120 at 124-25.)  Kim went on to testify that no controlled substances were found in the cotton ball. (Doc. 120 at 125.)

The motion for new trial went on to assert that the failure to disclose facts of Kim having tested the cotton ball substantially prejudiced Mr. DeFilippis. (Doc. 92 at 11.)  The motion recounted that a report documenting Kim's residue testing from the swab was not received by the Defense until June 4, 2021 at 5:50 PM, the day that

the Defense had presented its case-in-chief.[1] (Doc. 92 at 11; 92-1.)   The motion set out that the late disclosure of that report did not allow Mr. Defilippis *any* time to prepare for that evidence. (Doc. 92 at 11.)   It further argued that the Government ultimately used evidence of Kim's testing of the swab in closing argument to allege that the swab contained nothing to test. (Doc. 92 at 11.)   The alleged absence of testable material in the syringe was, moreover, consistent with the testimony of the detective, who alleged that the syringe found next to the victim purportedly contained nothing able to be tested. (Doc. 92 at 11.)  The motion for new trial thereby set out that the Government used undisclosed evidence to defeat Mr. Defilippis' legitimate defenses. (Doc. 92 at 11.)

The district court denied the motion for new trial on July 9, 2021. (Doc. 94.) With respect to the discovery issues, the court found that Mr. Defilippis' rights were not violated. (Doc. 94 at 9.)   In so holding, the court noted that it had offered to continue the trial in light of ongoing discovery. (Doc. 94 at 9.)   With respect to witness Kim, the court found that Mr. Defilippis called Kim as a witness and that "it is reasonable to assume that defense counsel would have spoken with Mr. Kim before or during trial in order to ascertain the contents of the syringe before calling him as a witness." (Doc. 94 at 9.)

---

[1] The Agency Exhibit Number listed on that report (822226), was not the same as the Agency Exhibit Number (798537) listed in Kim's report dated July 14, 2020. (Doc. 88-5.)

D. <u>Sentencing</u>

On September 8, 2021, the case proceeded to sentencing. (Doc. 102, 124.) At sentencing, the district court calculated the Sentencing Guidelines at total offense level 38 and criminal history category IV. (Doc. 124 at 25.) It also found that Count One provided for a mandatory sentence of life imprisonment based on the prior convictions for Florida offenses of Possession of Controlled Substances and Purchase of a Controlled Substance. (Doc. 124 at 25.)

Among his sentencing objections, Mr. Defilippis objected to sufficiency of the prior convictions that the Government sought to use to support the enhanced sentencing provisions under 21 USC § 851. (Doc. 98 at 31; 124 at 5-9.) The court overruled that objection. (Doc. 124 at 11-12.)

The court went on to impose concurrent sentences of life imprisonment on Count One and ten years imprisonment on Count Two. (Doc. 124 at 26.) The district court entered its judgment that same day. (Doc. 103.)

Mr. Defilippis filed a notice of appeal on September 10, 2021. (Doc. 106.)

He remains incarcerated on the judgment and sentence at issue.

**(ii)** **Statement of the Facts**

On April 18, 2020, the decedent, Jacob Rendina was found deceased in his home from a suspected accidental drug overdose. (Doc. 114 at 199, 210-11.) Rendina's girlfriend Ashley Frohnapfel had gone with Rendina to a bank parking lot

in the Brandon, Florida area on the day prior to Rendina's passing. (Doc. 114 at 197, 203.)  In the parking lot, Frohnapfel waited in the car while Rendina left for five to seven minutes and returned to the car. (Doc. 114 at 203-04.)  Rendina returned with a Xanax pill that he provided to Frohnapfel and a foil packed that Frohnapfel believed to contain heroin. (Doc. 114 at 204, 206.)

Frohnapfel did not see Mr. Defilippis while at the bank parking lot. (Doc. 114 at 205.)  Frohnapfel testified that she knew Mr. Defilippis and believed him to drive an older maroon four-door car based on having seem Mr. Defilippis in such a car at least one time prior. (Doc. 114 at 205.)  She also claimed that she had seen Mr. Defilippis provide heroin to Rendina on one prior occasion in March 2020. (Doc. 114 at 205-06.)

After leaving the bank, Frohnapfel and Rendina returned to their home. (Doc. 114 at 206-07.)  At the home, Rendina went into a bathroom. (Doc. 114 at 207.)  After several minutes, Frohnapfel went into the bathroom and found Rendina nodding off. (Doc. 114 at 207.)  Frohnapfel then began video recording Rendina on her phone. (Doc. 114 at 208.)  Frohnapfel testified that she did so so that Frohnapfel would see how he looked. (Doc. 114 at 208.)  One week earlier, Frohnapfel had herself overdosed on heroin. (Doc. 114 at 207.)  After several minutes, Rendina stood up and appeared energized. (Doc. 114 at 208.)

That night, Frohnapfel went to sleep in a bedroom while Rendina remained in the living room. (Doc. 114 at 209-10.) At around 10:30 A.M. the next morning, Frohnapfel found Rendina unresponsive with a syringe nearby. (Doc. 114 at 210-11.) She then attempted to administer Narcan. (Doc. 114 at 211.)

After law enforcement responded to the scene, Frohnapfel provided officers with Mr. Defilippis' phone number. (Doc. 114 at 221.) Law enforcement then conducted a "ruse" operation by posing as Rendina to attempt to contact Mr. Defilippis. (Doc. 116 at 107.) After sending various text messages, law enforcement sent messages to the effect of "'Can you help me out?' Leaning towards that I'm hurting and I need to meet him. 'I can meet you at the same spot by the bank.'" (Doc. 116 at 112.) The phone received a response "I can meet you like in 45 minutes." (Doc. 116 at 112.)

During that time, law enforcement was conducting surveillance on Mr. Defilippis. (Doc. 116 at 114-15.) Various deputies also placed themselves at locations around the back where Frohnapfel and Rendina had been the day prior. (Doc. 116 at 113.) During the surveillance, law enforcement observed Mr. Defilippis make several stops and then proceed to an Amscot that was across the street from the bank at issue. (Doc. 116 at 114-15.) After Mr. Defilippis' vehicle left the Amscot, law enforcement followed it and conducted a traffic stop ten minutes

later. (Doc. 116 at 115.) Law enforcement did not see Mr. Defilippis conduct any drug transactions during the surveillance. (Doc. 116 at 167.)

Law enforcement took Mr. Defilippis to the ground outside of his vehicle and placed him in handcuffs. (Doc 116 at 185-87.) Law enforcement broke Mr. Defilippis' arm in the process. (Doc. 116 at 197.) A black fanny pack that Mr. Defilippis was allegedly wearing was found nearby and searched. (Doc. 116 at 204.) Inside the fanny pack were baggies containing suspected heroin, cocaine, Xanax, hydromorphone, drug paraphernalia and $990. (Doc. 116 at 204-05.)

Law enforcement found in the car a cell phone utilizing the phone number law enforcement had contacted during its ruse investigation. (Doc. 116 at 116.) A baggie containing white powder was found in the center console of the vehicle. (Doc. 118 at 93-94.) A field test of the substance in that baggie did not show the presence of controlled substances. (Doc. 118 at 95.)

Frohnapfel additionally testified at trial that she knew Rendina to obtain heroin from multiple other sources to include Rendina's brother and a dealer she knew as "Old Man Joe." (Doc. 116 at 12-16.) She further testified that she did not know if, after she went to bed, Rendina obtained heroin from another source aside from the person at the bank. (Doc. 116 at 43-44.) She also did not know if Rendina had any heroin left after he overdosed in the bathroom before she went to bed. (Doc. 116 at 48.)

Law enforcement later obtained surveillance footage from the bank at issue from the time frame when Frohnapfel said Rendina had made the purchase in the parking lot. (Doc. 116 at 117-18.) Frohnapfel identified the vehicle she believed to belong to Mr. Defilippis in that surveillance footage. (Doc. 116 at 119.)

Law enforcement also conducted cellular site analysis on the phone connected to Mr. Defilippis. (Doc. 118 at 41-85.) The phone was connecting to a tower in the vicinity of the bank at the time of the alleged transaction. (Doc. 118 at 41-85.)

At trial, the Government presented evidence of the Facebook communications that were the subject of the Rule 404(b) notice. (Doc. 118 at 111-37.) The messages were from March 21, 2020 and April 13, 2020. (Doc. 118 at 111-37.) The messages were purportedly between Mr. Defilippis and three other individuals and allegedly included discussions of making purchases of narcotics. (Doc. 118 at 111-37.) The communications included discussions of Henry, DVDs, Zannies and boi, which law enforcement alleged were code words for narcotics. (Doc. 118 at 122-36.)

The Government additionally presented evidence that Mr. Defilippis and Rendina had communicated about meeting shortly before the alleged transaction at the bank. (Doc. 118 at 133.)

When Mr. Defilippis testified, he recounted how he had developed a drug addiction that he struggled with for much of his life. (Doc. 120 at 128-145.) He also testified to the friendship he shared with Redina. (Doc. 120 at 145-46.) He recounted

that he and Rendina had used drugs and had provided drugs to one another on occasions. (Doc. 120 at 146-47.) With respect to April 17, 2020, Mr. Defilippis testified that he had met up with Rendina in the bank parking lot and Rendina had given him some Xanax pills. (Doc. 120 at 148.) Rendina had obtained the pills from his brother Joshua who was also at the bank parking lot that afternoon and who had a prescription for Xanax. (Doc. 120 at 148.) Mr. Defilippis did not provide any heroin to Rendina that day. (Doc. 120 at 148.) Mr. Defilippis, likewise, did not have any contact with Rendina after that meeting at the bank. (Doc. 120 at 119.)

Mr. Defilippis was later convicted and sentenced as set forth above.

This appeal follows.


**(iii)** **Standards of Review**

As to Issue I, this Court reviews *Brady* violations *de novo*, "but [] review[s] the denial of a motion for a new trial based on these alleged *Brady* or *Giglio* violations for an abuse of discretion." *United States v. Barroso*, 719 Fed.Appx. 936, 938 (11th Cir. 2018). The Court similarly reviews a district court's ruling on a discovery violation for an abuse of discretion. *United States v. Euceda-Hernandez*, 768 F.2d 1307, 1311-12 (11th Cir. 1985).

As to Issue II, this Court reviews the sufficiency of the evidence *de novo*. *United States v. McCrimmon*, 362 F.3d 725, 728 (11th Cir. 2004). In conducting

that review, the Court "views the evidence in the light most favorable to the government, making all reasonable inferences and credibility choices in the government's favor to determine whether a rational jury could have found the defendant guilty beyond a reasonable doubt." *Id.*

As to Issues III and IV, evidentiary rulings regarding the admission of evidence are reviewed for abuse of discretion. *United States v. Fortenberry*, 971 F.2d 717, 721 (11th Cir. 1992), *cert. denied* 506 U.S. 1068 (1993).

As to Issue V, this Court reviews *de novo* a district court's application of the enhanced sentencing provisions set forth in 21 U.S.C. §§ 841(b)(1)(B) and 851. *United States v. McLean*, 138 F.3d 1398, 1406 (11th Cir. 1998).

# SUMMARY OF THE ARGUMENTS

The Government violated Mr. Defilippis' substantial rights when it failed to timely disclose to the Defense all evidence concerning the forensic testing conducted by the two experts at issue. The undisclosed and late disclosed evidence derailed Mr. Defilippis' defense. Mr. Defilippis had absolutely no adequate time to prepare for that crucial evidence. The district court, therefore, erred in denying the motion for a new trial.

The district court further erred as a matter of law in denying Mr. Defilippis' motion for a judgment of acquittal on Count One because the Government failed to present sufficient evidence upon which a reasonable trier of fact could conclude that the substance that Mr. Defilippis purportedly provided to the decedent was the but for cause of the decedent's death.

The district court additionally erred in permitting the Government to admit evidence of the collateral prior alleged drug activity. That evidence was irrelevant to proving any material fact at trial. Moreover, the undue prejudicial effect of that evidence outweighed whatever probative value it may have had.

The court similarly erred in overruling Mr. Defilippis' objection to the photographs that showed him wearing an orange jail uniform. The undue prejudice of the jury seeing those photographs far outweighed the minimal probative value of

that evidence, particularly given that Mr. Defilippis offered to show the jury his tattoos in lieu of the photographs being admitted.

Finally, the district court erred in its application of 21 U.S.C. § 841(b)(1)(C) and its resulting imposition of a mandatory life sentence. The prior predicate convictions of Mr. Defilippis did not qualify as "serious drug felonies" despite having purportedly qualified as "felony drug offenses." The use of those prior convictions to impose a mandatory life sentence under subsection 841(b)(1)(C) was thereby inconsistent with legislative intent and in violation of Mr. Defilippis' constitutional rights.

## ARGUMENTS AND CITATIONS OF AUTHORITY

## I.

**THE DISTRICT COURT ERRED IN DENYING MR. DEFILIPPIS' MOTION FOR A NEW TRIAL BASED ON THE GOVERNMENT'S FAILURE TO TIMELY DISCLOSE CRITICAL MATERIAL EVIDENCE**

The Government's failure to timely disclose evidence of the testing performed by expert witnesses Pearson and Kim violated Mr. Defilippis' substantial rights. The failure to disclose portions of that evidence likewise violated the holding of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The late and undisclosed evidence struck at the heart of Mr. Defilippis' defense. Mr. Defilippis, however, had no reasonable time to prepare for that critical evidence. But for the Government's withholding of that evidence, even if done unintentionally, there exists a reasonable probability that the result of the trial would have been different. The district court thereby committed reversible error in denying Mr. Defilippis' motion for a new trial.

## A. The Government's Discovery Violations

### 1. *Brady v. Maryland* and its Progeny

*Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and the many cases that have followed it can be traced back to *Mooney v. Holohan*, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935). In *Mooney*, the Supreme Court held:

[I]f a state has contrived a conviction through the pretense of a trial

which in truth is but used as a means of depriving a defendant of liberty through a deliberate deception of court and jury by the presentation of testimony known to be perjured[,] [s]uch a contrivance by a State to procure the conviction and imprisonment of a defendant is ... inconsistent with the rudimentary demands of justice....

*Id*. at 112. When it later decided the landmark *Brady* opinion, the Supreme Court held: "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87.

"Evidence is favorable to the accused for *Brady* purposes if it is exculpatory or impeaching." *United States v. Barroso*, 719 Fed.Appx. 936, 939 (11th Cir. 2018) *citing United States v. Naranjo*, 634 F.3d 1198, 1212 (11th Cir. 2011). As a result, "evidence that could be useful in impeaching prosecution witnesses must be disclosed under *Brady.*" *Smith v. Sec'y Dep't of Corrs.*, 572 F.3d 1327, 1343 (11th Cir. 2009); *see also Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959) ("The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend").

"*Brady* evidence is material 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been

different.'" *Barroso*, 719 Fed.Appx. at 939 *quoting United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). "The burden to establish a *Brady* violation lies with the defendant." *Id. citing United States v. Esquenazi*, 752 F.3d 912, 933 (11th Cir. 2014). In *United States v. Bagley*, the Supreme Court expressly adopted the *Strickland* prejudice prong standard, *i.e.* "reasonable probability of a different outcome", as the standard to be employed when reviewing the materiality of undisclosed evidence in *Brady* cases.

In deciding the aforementioned *Bagley* case, the Supreme Court wrote:

> By requiring the prosecutor to assist the defense in making its case, the *Brady* rule represents a limited departure from a pure adversary model. The Court has recognized, however, that the prosecutor's role transcends that of an adversary: he "is the representative not of an ordinary party to a controversy, but of a sovereignty ... whose interest ... in a criminal prosecution is not that it shall win a case, but that justice shall be done."

*Bagley*, 473 U.S. at 675 n.6 *quoting Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935) *citing Brady,* 373 U.S. at 87-88, 83 S.Ct. at 1196-1197. A decade later, in *Kyles v. Whitley*, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), the Court again emphasized the prosecution's critical duties to ensure compliance with *Brady*:

> A prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police… But whether the prosecutor succeeds or fails in meeting this obligation (whether, that is, a failure to disclose is in good faith or bad faith) the prosecution's responsibility for failing to disclose known,

favorable evidence rising to a material level of importance is inescapable.

*Kyles*, 514 U.S. at 437-38. The prosecution thereby bears an obligation to not only turn over all information that might fall within the purview of Brady, but to also seek out any such information that might exist.

With the foregoing holdings in mind, "[t]o establish a Brady violation, the defendant must show that (1) the government possessed favorable evidence to the defendant; (2) the defendant does not possess the evidence and could not obtain the evidence with any reasonable diligence; (3) the prosecution suppressed the favorable evidence; and (4) had the evidence been disclosed to the defendant, there is a reasonable probability that the outcome would have been different." *United States v. Vallejo*, 297 F.3d 1154, 1164 (11th Cir. 2002) *citing United States v. Meros*, 866 F.2d 1304, 1308 (11th Cir. 1989).

## 2. The Rule 16 Obligations

Notwithstanding the Government's obligations with respect to *Brady* material, Rule 16 of the Federal Rules of Criminal Procedure imposes numerous discovery obligations. Among them, "the government must permit the defendant to inspect and to copy or photograph certain documents, including photographs, that are within the government's control if they are material to preparing the defense or the government intends to use them in its case-in-chief at trial." *United States v. Manriquez*, 713 Fed.Appx. 885, 889 (11th Cir. 2017) *citing* FED. R. CRIM. P.

16(a)(1)(E). With respect to expert witnesses, at the time of Mr. Defilippis' trial

Rule 16 imposed further disclosure obligations on the Government:

> G) Expert Witnesses. At the defendant's request, the government must give to the defendant a written summary of *any* testimony that the government intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence during its case-in-chief at trial. If the government requests discovery under subdivision (b)(1)(C)(ii) and the defendant complies, the government must, at the defendant's request, give to the defendant a written summary of testimony that the government intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence as evidence at trial on the issue of the defendant's mental condition. The summary provided under this subparagraph must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications.

FED. R. CRIM. P. 16(a)(1)(G) (2021) (emphasis added).[2] The district court,

moreover, in its pretrial discovery order, directed the Government to comply with

those discovery obligations by December 2020, months before the trial began.

A violation of the discovery obligations mandates a reversal of a conviction if

the violation affected the defendant's substantial rights. *Manriquez*, 713 Fed.Appx.

at 890; *United States v. Rivera*, 944 F.2d 1563, 1566 (11th Cir. 1991). This Court

measures the prejudice resulting from a discovery violation "mainly by how the

violation affected the defendant's ability to prepare a defense." *Manriquez*, 713

Fed.Appx. at 890 *citing United States v. Chastain*, 198 F.3d 1338, 1348 (11th Cir.

---

[2] The expert witness subsection of Rule 16 has since been substantially revised to provide for even greater disclosure obligations.

1999).  The Government's untimely disclosure of the evidence at issue undoubtedly and substantially impaired Mr. Defilippis' ability to prepare his defense.

    B. <u>The Discovery Violations Violated Mr. Defilippis' Substantial Rights</u>

    The Government clearly withheld from the Defense, whether in good faith or not, critical evidence of testing performed by two expert witnesses.  Given that the "but-for" causation element was the central issue in dispute at trial, the late and undisclosed evidence of the experts' testing could not have been any more critical. The record clearly establishes that Mr. Defilippis was unduly surprised by the undisclosed testimony of expert witnesses Pearson and Kim concerning testing they performed.  Indeed, the record clearly indicates that Mr. Defilippis intended to present a defense revolving around the lack of a match between the substances in the mixture found in his possession and the substances found in the decedent's blood and in the paraphernalia found near his body.  The untimely disclosed evidence, however, directly countered such a defense.  Under the circumstances, Mr. Defilippis lacked any adequate opportunity to prepare his defense in light of the late and undisclosed evidence.

    With respect to Dr. Pearson, Mr. Defilippis learned just four days prior to the trial that she allegedly found that the foil packets located near the decedent contained the same three substances allegedly contained in the baggies that were in Mr. Defilippis' possession when he was arrested.  Indeed, prior to that revelation, the

evidence from analyst Kim seemed to indicate that the substances contained in the foil packets and baggies did not match. The untimely disclosure of Dr. Pearson's testing results thereby struck a fatal blow to Mr. Defilippis' defense on what was effectively the eve of the trial.

To further exacerbate the prejudice resulting from that error, Dr. Pearson then testified at trial to having performed testing of the decedent's blood out of "intellectual curiosity." Doc. 118 at 258. She then testified that the decedent's blood contained some small amount of quinine. She had not, however, documented that alleged finding in any report. Doc. 118 at 253. Mr. Defilippis was, consequently, blindsided by that testimony. The testimony was, moreover, crucial to the Government's case because it further connected the substances alleged to have been in the baggies in Mr. Defilippis' possession to the substances that the decedent consumed. Mr. Defilippis had no time whatsoever to prepare for that crucial testimony or to seek expert assistance in contesting Dr. Pearson's allegations.

If the discovery violations underlying Dr. Pearson's testimony were not enough, the undisclosed evidence of William Kim's testimony perpetuated the violation of Mr. Defilippis' substantial rights. Kim's testimony concerning the testing of the cotton swab was critical in that it corroborated the lead detective's claim that no substances were found on the syringe located next to the decedent. That evidence was, however, also exculpatory evidence that the Government had an

obligation to disclose under *Brady.* Clearly, the lack of the presence of a substance is evidence that fails to link the substance(s) that the decedent injected to the substances that were found next to Mr. Defilippis. Moreover, the lack of the presence of any substances on the syringe and the swab found next to the decedent supports the argument that the Government failed to present sufficient evidence to prove the but for causation element of the alleged offense. Because, however, Mr. Defilippis had no time whatsoever to prepare for Kim's testimony concerning the testing of the swab, he had no opportunity to prepare for any such argument or attendant witness questioning.

Moreover, to the extent that the lower court seemingly believed that the Government had no obligation to disclose Kim's testing evidence given that Kim was called as a defense witness, the potentially exculpatory nature of Kim's testing triggered the Government's disclosure obligations under *Brady.* Given the nature of that evidence, there exists a reasonable probability that the outcome of the trial would have been different but for the failure to disclose evidence of Kim's testing of the cotton swab. Given the totality of the evidence presented at trial, coupled with the reasonable explanation of innocence that Mr. Defilippis gave during his trial testimony, the jury very likely would have acquitted Mr. Defilippis had the Defense been aware of Kim's testing prior to trial.

As set forth above, the Government's discovery violations undoubtedly

violated Mr. Defilippis's substantial rights. The evidence at issue went to the heart of the but for causation element. That element was, in turn, the crux of Mr. Defilippis' defense. Mr. Defilippis had no reasonable time to prepare for that critical evidence. The district court, therefore, committed reversible error in denying Mr. Defilippis' motion for a new trial in this case.

## II.

**THE DISTRICT COURT ERRED IN DENYING MR. DEFILIPPIS' MOTION FOR A JUDGMENT OF ACQUITTAL BECAUSE THE GOVERNMENT PRESENTED INSUFFICIENT EVIDENCE TO PROVE THE BUT-FOR CAUSATION ELEMENT OF COUNT ONE.**

The evidence presented at trial failed to prove that the substances that Mr. Defilippis allegedly provided to the decedent were the but for cause of the decedent's death. The evidence established that the decedent had numerous drug suppliers. The evidence also failed to account for the decedent's actions in the hours leading up to his death. The scientific evidence, furthermore, failed to sufficiently match the substances found in Mr. Defilippis' possession with the substances that the decedent fatally injected. The Government's evidence was, therefore, inadequate to prove the Count One charge of distribution of a controlled substance resulting in death. The district court, consequently, erred in denying Mr. Defilippis' motion for judgment of acquittal based on the insufficiency of the evidence.

21 U.S.C. § 841(a)(1) proscribes the knowing or intentional distribution of a controlled substance. Given the text of the statute, the Government is required to prove that a defendant distributed the controlled substance knowingly and intentionally. 21 U.S.C. § 841(a)(1). Section 841, in addition, provides for an enhanced penalty of if a person distributes a controlled substance, and "death or serious bodily injury results from the use of such substance." 21 U.S.C. §

841(b)(1)(C) *see also United States v. Benjamin*, 958 F.3d 1124, 1131 (11th Cir. 2020). When reviewing a jury's finding of guilt on a 21 U.S.C. § 841(a)(1) conviction, this Court will reverse the conviction if it determines that a reasonable factfinder could not have found proof of guilt beyond a reasonable doubt as to all of those requisite elements. *United States v. Anderson*, 289 F.3d 1321, 1325 (11th Cir. 2002).

Concerning the "results in death" element, a defendant cannot be convicted under the enhanced penalty provision unless the Government proves beyond a reasonable doubt that the use of the controlled substance issue was the but-for cause of the death or injury. *Burrage v. United States*, 571 U.S. 204, 218-19, 134 S.Ct. 881, 187 L.Ed.2d 715 (2014). The Supreme Court arrived at that holding after analyzing section 841's use of the "results from" language in the enhanced sentencing provision of the statute. *Id*; *see also Benjamin*, 958 F.3d at 1131-32. "But-for cause 'requires proof 'that the harm would not have occurred in the absence of -- that is, but for -- the defendant's conduct.'" *Benjamin*, 958 F.3d at 1131 *quoting Burrage v. United States*, 571 U.S. at 211, 134 S.Ct. 881 (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 346–47, 133 S.Ct. 2517, 186 L.Ed.2d 503 (2013)). This Court has further provided that "'but-for causality does not require that a single factor alone produce the particular result.'" *Id.* at 1131-32 *quoting United States v. Feldman*, 936 F.3d 1288, 1311 (11th Cir. 2019). "Instead, a jury

may find but-for causation 'if the predicate act combines with other factors to produce the result, so long as the other factors alone would not have done so -- if, so to speak, it was the straw that broke the camel's back.'" *Id.* at 1132 *quoting id* (emphasis omitted) (quoting *Burrage*, 571 U.S. at 211, 134 S.Ct. 881).

The totality of the circumstances of this case demonstrates that Mr. Defilippis' conviction rests on insufficient evidence. The evidence failed to permit a finding that any substance that Mr. Defilippis *might* have provided to the decedent was the cause of the decedent's death. As the decedent's girlfriend's testimony established, the decedent had numerous other suppliers of controlled substances aside, purportedly, from Mr. Defilippis. The decedent's girlfriend, moreover, was not in the decedent's direct presence in the many hours before his death. As she testified, she did not know whether the decedent left the house to get drugs or if he met any dealers at his home to get drugs after she went to her bedroom. Indeed, the Government presented no evidence of what actions the decedent took in the critical hours prior to his death.

Furthermore, as discussed above, the forensic testing performed in connection with the case failed to establish the but for causation element. The Government presented no evidence of any substances found in the syringe located next to the decedent – the syringe that apparently administered the fatal drugs. As the medical examiner's chief toxicologist testified, the medical examiner's office had the ability

to test syringes for the presence of substances even if field testing does not otherwise indicate the presence of any substance. Despite that available technology, law enforcement never provided the syringe to the medical examiner's office to perform any such testing.

The closest the Government could come to proving the causation element was its attempt to link the substances found in the foil next to the decedent with the substances found in the baggies in Mr. Defilippis' possession. The Government failed, however, to sufficiently link the substances found in Mr. Defilippis' possession to prove but for causation. To be sure, one must perform an impermissible stacking of inferences to reach the conclusion that Mr. Defilippis must have provided the substances that caused the decedent's death merely because the substances in Mr. Defilippis' possession might have been the same mixture of substances found in the foil packets.

Given the evidence presented, no reasonable trier of fact could have concluded that the Government proved the but for causation element required of Count One. The evidence left far too many unclosed doors. While the jury *might* arguably have found that Mr. Defilippis provided a substance to the decedent, the evidence simply could not establish that any such substance was the but for cause of the decedent's death. Mr. Defilippis, therefore, asks this Court to reverse his

conviction on Count One and remand this case to the district court with instructions to enter a judgment of acquittal.

## III.

## THE COLLATERAL EVIDENCE LISTED IN THE GOVERNMENT'S RULE 404 NOTICE WAS IRRELEVANT TO THE ELEMENTS AT ISSUE AT TRIAL AND WAS UNDULY PREJUDICIAL TO THE APPELLANT

The district court abused its discretion in admitting evidence concerning the alleged collateral drug dealing acts. The evidence regarding the prior alleged drug activity was extrinsic to the charged offenses and was irrelevant to proving any element at issue during trial. The evidence, therefore, fell far short of meeting the standard of admissibility as either intrinsic evidence or as extrinsic Rule 404(b) evidence. Moreover, the highly prejudicial effect of that evidence substantially outweighed what little probative value it may have had. Aside from that improperly admitted evidence, the Government's remaining evidence was insufficient to support the jury's verdict. As a result, the error in admitting the extrinsic collateral crime evidence was not harmless.

A. The Collateral Evidence was Inadmissible Under Rule 404(b).

Evidence of extrinsic collateral acts is only admissible under Rule 404(b) "if relevant to an issue other than the defendant's character or propensity to commit a crime." *United States v. Duran*, 596 F.3d 1283, 1298 (11th Cir. 2010) *citing United*

*States v. Beechum*, 582 F.2d 898, 911 (5th Cir. 1978) (en banc). The evidence must be used to prove some fact necessary to the charged offense "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." *United States v. Nerey*, 877 F.3d 956, 974 (11th Cir. 2017) *quoting* FED. R. EVID. 404(b)(2). To establish the admissibility of evidence under Rule 404(b), the Government bears the burden of proving "'(1) a proper purpose for introducing the evidence; (2) that the prior act occurred, and that the defendant was the actor; and (3) that the probative value of introducing the evidence outweighs any prejudicial effect the evidence might have.'" *Duran*, 596 F.3d at 1298 *quoting United States v. Cancelliere*, 69 F.3d 1116, 1124 (11th Cir. 1995). Evidence proposed to be admitted under Rule 404(b) is still, therefore, subject to exclusion under Rule 403. The question of whether collateral acts evidence is admissible under 404(b) "calls for a commonsense assessment of all the circumstances surrounding the extrinsic offense, including prosecutorial need, overall similarity between the extrinsic act and the charged offense, as well as temporal remoteness." *United States v. Perez*, 443 F.3d 772, 780 (11th Cir. 2006) *quoting United States v. Jernigan*, 341 F.3d 1273, 1282 (11th Cir. 2003). Furthermore, if the evidence is insufficient for a factfinder to determine that the defendant committed the extrinsic act or if the extrinsic act is relevant only to suggest bad character, it cannot be admitted. *Id.* at 779.

In the instant case, the evidence of the alleged prior drug activity was not relevant to proving any material fact at issue in the trial. The Facebook messages that purportedly discussed the prior alleged drug activity included no explicit discussion of drug transactions. A detective indeed had to testify that certain words contained in the communications were purported references to drugs. Those words were not, in themselves, commonly known to be slang terms for drugs. The Facebook communications likewise did not include any discussion of quantities or prices of drugs. Therefore, with respect to the second prong of the Rule 404(b) admissibility test, any allegation that the Facebook evidence showed that prior drug transactions occurred, and that Mr. Defilippis committed any such acts was speculative at best.

In the end, the collateral acts evidence served no discernible purpose other than to purportedly suggest that Mr. Defilippis is a drug dealer and that he purportedly acted in conformity with that trait on the day in question. The use of the collateral acts evidence thereby violated the core tenant of Rule 404(b)'s preclusion of evidence that is relevant to nothing other than alleged bad character.

Finally, as to the final prong of the Rule 404(b) analysis, the collateral evidence of alleged illicit drug dealing activity is highly prejudicial to a defendant who is charged with distribution of controlled substances causing death. While all evidence is generally inherently prejudicial to the opposing party, the prejudice must

be balanced against the probative value of the evidence. As set forth above, the collateral evidence had minimal probative value. That evidence, on the other hand, surely had an adverse impact on the jury's verdict. It is hard to imagine that even the most reasonable and fair-minded juror could set aside the facts of the collateral evidence and give a defendant a fair trial in a case that alleged illicit drug dealing that resulted in death. As a result, the prejudicial value of the collateral evidence heavily outweighed any minimal probative purpose that the evidence may have served. It was not therefore admissible under Rule 404(b) and, in any event, should have been excluded under Rule 403.

B. The Error in Admitting the Collateral Crimes Evidence was not Harmless.

An error in admitting collateral crimes evidence is not harmless if it is reasonably likely that the erroneously admitted evidence affected the defendant's substantial rights. *United States v. Baker*, 432 F.3d 1189, 1223-24 (11th Cir. 2005) *abrogation on other grounds rec'd in United States v. Weiler*, 652 Fed.Appx. 913, 915 (11th Cir. 2016). As set forth above, the main material issue in dispute at trial was the but for causation element. The collateral acts evidence lent nothing to the Government's proof of that element. Again, as set forth above, the Government's evidence was insufficient to establish the requisite causal link between the substances that Mr. Defilippis allegedly provided and the substances that caused the decedent's death. Under the circumstances, had the jury not heard evidence of the

collateral acts, it would not likely have found Mr. Defilippis guilty. The admission of the collateral drug dealing allegations surely detracted from the material issue at hand and tipped the scales in favor of the jurors' guilty votes. The collateral drug dealing allegations became a feature of the trial. The undue prejudicial effect of the collateral evidence, therefore, clearly affected Mr. Defilippis' substantial rights.

## IV.

## THE DISTRICT COURT ERRED IN ADMITTING THE PHOTOGRAPHS THAT SHOWED MR. DEFILIPPIS IN AN ORANGE JAIL JUMPSUIT

The district court further abused its discretion in permitting the Government to introduce the three photographs that depicted Mr. Defilippis in what was an obvious jail uniform. The undue prejudicial effect of permitting the jury to see Mr. Defilippis in jail garb far outweighed the minimal probative value that the photographs may have had. Moreover, Mr. Defilippis offered an alternative means to provide the probative evidence the Government sought when he offered to show the tattoos on his arms in lieu of the Government admitting the photographs. The district court thereby erred in overruling Mr. Defilippis' objections to the photographs.

The advisory notes to Rule 403 provide that "'unfair prejudice' within its context means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." FED. R. EVID. 403 cmt. (1972). In performing the balancing test required under Rule 403, the trial court

must weigh "the probative value of and need for the evidence against the harm likely to result from its admission." *Id.* The long-recognized need for the Rule 403 protections is "to avoid the danger that a jury will convict a defendant based upon reasons other than evidence establishing his guilt." *McDuffie v. State*, 970 So. 2d 312, 326 (Fla. 2007) *citing Taylor v. State*, 855 So. 2d 1, 22 (Fla. 2003).

In the instant case, the jury's exposure to pictures of Mr. Defilippis in jail clothing very likely contributed to the jury's guilty verdict. Contrary to the district court's assessment of the photographs, the photographs clearly depicted Mr. Defilippis in what any reasonable person would recognize as a jail uniform. The only relevant probative value the photographs possessed was to show the tattoos on Mr. Defilippis' arms. Even still, evidence of the tattoos only had very minimal significance to the Government's case. As a result, Mr. Defilippis' offer to show his tattoos to the jury would have allowed the Government to elicit the evidence it sought without creating any risk of undue prejudice. Because, however, the district court rejected that proposition and admitted the photographs, the jury unnecessarily saw Mr. Defilippis dressed in a jail uniform and was left to speculate as to why Mr. Defilippis had been incarcerated in that instance. In the end, that evidence served no legitimate purpose other than to inflame the jury and lessen the Government's burden of proof. Under the circumstances, the prejudicial effect of the evidence far outweighed whatever minimal probative value it may have possessed. The district

court, consequently, abused its discretion and violated Mr. Defilippis' rights to due process and to a fair trial when it allowed that evidence to be admitted.

## V.

### THE DISTRICT COURT ERRED IN SENTENCING MR. DEFILIPPIS UNDER THE ENHANCED SENTENCING PROVISIONS OF 21 U.S.C. §§ 841(b)(1)(C) and 851 BASED ON HAVING SUSTAINED PRIOR CONVICTIONS FOR A "FELONY DRUG OFFENSE"

The district court erred as a matter of law in imposing a mandatory life sentence under 21 U.S.C. § 841(b)(1)(C) based on Mr. Defilippis having sustained prior convictions for "felony drug offenses." The prior convictions at issue did not qualify as "serious drug offenses" needed to trigger enhanced sentencing provisions under subsections 841(b)(1)(A) and 841(b)(1)(B), both of which punish offenses that involve greater quantities of drugs than offenses punished under subsection 841(b)(1)(C). The lower court's literal interpretation of subsection 841(b)(1)(C) thereby ended in an absurd result that was inconsistent with legislative intent and violative of Mr. Defilippis' constitutional rights to due process and equal protection.

A. "Felony Drug Offenses" and "Serious Drug Felonies"

Subsections (b)(1)(A) and (b)(1)(B) of 21 U.S.C. § 841 provide for enhanced penalties if a defendant commits the offense after a prior conviction for a "serious drug felony" or "serious violent felony" has become final. 21 U.S.C. § 841(b)(1)(A),

(b)(1)(B).  Inexplicably, subsection (b)(1)(C), on the other hand, provides for enhanced penalties if a defendant commits the offense after a prior conviction for a "felony drug offense."  21 U.S.C. § 841(b)(1)(C).

The definition for "serious drug felony" is found in 21 U.S.C. § 802(57), which cross-references the definition provided for under the Armed Career Criminal Act at 21 U.S.C. § 924(e):

> (57)The term "serious drug felony" means an offense described in section 924(e)(2) of Title 18 for which—
>
> (A) the offender served a term of imprisonment of more than 12 months; and (B) the offender's release from any term of imprisonment was within 15 years of the commencement of the instant offense.

21 U.S.C. § 802(57).  Section 924(e), in turn, defines the term "serious drug offense" as:

> (i) an offense under the Controlled Substances Act (21 U.S.C. 801 et seq.), the Controlled Substances Import and Export Act (21 U.S.C. 951 et seq.), or chapter 705 of title 46 for which a maximum term of imprisonment of ten years or more is prescribed by law; or
>
> (ii) an offense under State law, involving manufacturing, distributing, or possessing with intent to manufacture or distribute, a controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802)), for which a maximum term of imprisonment of ten years or more is prescribed by law;

18 U.S.C. § 924(e)(2)(A)(i)-(ii).  Section 802 then defines "felony drug offense" as: "an offense that is punishable by imprisonment for more than one year under any law of the United States or of a State or foreign country that prohibits or restricts

conduct relating to narcotic drugs, marihuana, anabolic steroids, or depressant or stimulant substances." 21 U.S.C. § 802(44).

In the instant case, the "felony drug offenses" that Mr. Defilippis was alleged to have been convicted of were Florida offenses of Possession of a Controlled Substance and Purchase of a Controlled Substance. Florida proscribes Possession of a Controlled Substance as a third-degree felony punishable by up to five years imprisonment. FLA. STAT. § 893.13(6)(a). It proscribes the offense of simple Purchase of a Controlled Substance as a second-degree felony punishable by up to fifteen years imprisonment. FLA. STAT. § 893.13(2)(a). Neither of the Florida offenses can qualify as "serious drug felonies" under the federal controlled substances statutes. The Florida offense of Possession of a Controlled Substance obviously cannot qualify because it is capped by a maximum sentence of five years imprisonment. Likewise, neither Possession of a Controlled Substance nor Purchase of a Controlled Substance can qualify because neither carries an element of manufacturing, distributing, or possessing with intent to manufacture or distribute. *See* FLA. STAT. § 893.13(2)(a), (6)(a). Nonetheless, either offense could arguably qualify as a "felony drug offense" because they are both punishable by more than one year imprisonment. Therefore, under the literal application of 21 U.S.C. § 841(b)(1)(C) that the lower court employed, the qualification of the prior offenses as "felony drug offenses" subjected Mr. Defilippis to a higher mandatory minimum

sentence under subsection 841(b)(1)(C) than someone with the same prior record who traffics in much greater quantities of controlled substances and is charged under subsections 841(b)(1)(A) or 841(b)(1)(B). Congress could not have intended such an absurd result when it recently revamped section 841 in the First Step Act.

B. The First Step Act Substantially Revised the Mandatory Minimum Sentencing Provisions of 21 U.S.C. § 841.

The First Step Act amended 21 U.S.C. § 841 in an effort to provide greater equity and fairness in sentencing. *See* First Step Act of 2018, Pub. L. No. 115-391, § 401(a)(2), 132 Stat. 5194, 5220 (Dec. 21, 2018) ("FSA"). Prior to the First Step Act, any prior "felony drug offense" triggered the enhanced maximum and mandatory minimum penalties set forth in Section 841. The First Step Act sought to "restrict" those easily triggered mandatory minimum sentences by replacing the broadly defined "felony drug offense" with the more restrictive and narrowly defined classifications "serious drug felony" and "serious violent felony." FSA, § 401 (section entitled "Reduce and Restrict Enhanced Sentencing for Prior Drug Felonies").

1. The Imposition of the Mandatory Life Sentence under Subsection 841(b)(1)(C) was an Absurd Result that was Contrary to Legislative Intent

While Congress replaced the term "felony drug offense" with those new terms in subsections 841(b)(1)(A) and (b)(1)(B), it failed to do the same in subsection 841(b)(1)(C). No rational explanation exists to support that omission. Indeed, the

revisions to Section 841 substantially limited the application of enhanced sentencing provisions applicable to the most serious offenses punished under the statute, but failed to do so for the less serious offenses. The literal application of 21 U.S.C. § 841(b)(1)(C) thereby mandates that a person convicted of distributing a lesser quantity of drugs is punished more harshly than someone with the same prior record who distributes a greater quantity. For that reason, a literal application of 21 U.S.C. § 841(b)(1)(C) results in an irrational and disproportionate sentencing scheme that is inconsistent with legislative intent and violates the constitutional rights to due process and equal protection.

Where, as here, a literal application of the text of a statute produces absurd results that are demonstrably at odds with Congressional intent, a sentencing court should decline to apply the law literally. To be sure, the tenets of statutory interpretation generally require that when the statutory text is plain, "every clause and word of a statute should, if possible, be given effect." *Chickasaw Nation v. United States*, 534 U.S. 84, 93, 122 S.Ct. 528, 151 L.Ed.2d 474 (2001) (internal marks and citations omitted). This Court, in addition, has provided that "[a] drafting body such as the Sentencing Commission 'generally acts intentionally when it uses particular language in one section...but omits it in another.'" *United States v. Dupree*, 57 F.4th 1269, 1278 (11th Cir. 2023) *quoting Dep't of Homeland Sec. v. MacLean*, 574 U.S. 383, 391, 135 S.Ct. 913, 190 L.Ed.2d 771 (2015). Those general rules are

not, however, absolute. The plain meaning of legislation is not conclusive if the literal application of the language would lead to absurd results. See, e.g., *Chickasaw Nation*, 534 U.S. at 94 ("In this instance, to accept as conclusive the canons on which the Tribes rely would produce an interpretation that we conclude would conflict with the intent embodied in the statute Congress wrote."); *Crooks v. Harrelson*, 282 U.S. 55, 59-60, 51 S.Ct. 49, 75 L.Ed. 156 (1930); *see also Green v. Bock Laundry Machine Co.*, 490 U.S. 504, 509-10, 109 S.Ct. 1981, 104 L.Ed.2d 557 (1989) (declining to enforce plain text because "that literal reading would compel an odd result in a case like this"); *United States v. Ryan*, 284 U.S. 167, 175, 52 S.Ct. 65, 76 L.Ed. 224 (1931) ("A literal application of a statute which would lead to absurd consequences is to be avoided whenever a reasonable application can be given which is consistent with the legislative purpose."). Indeed, imposing a more serious sentence for a less serious offense is an absurdity that "shock[s both] general moral [and] common sense." *Crooks*, 282 U.S. at 60.

No evidence exists to suggest that Congress intended the absurd result that the literal application of subsection 841(b)(1)(C) creates. First, in the FSA, Congress declined to revise section 841's quantity-based thresholds. Second, Congress similarly declined to revise the graduated punishments set forth in section 841 based on drug quantity and prior convictions. While Congress lowered some of the mandatory minimum provisions of subsection 841(b)(1)(A), it ensured that those

penalties remained more severe than the corresponding penalties in subsection 841(b)(1)(B). Third, the FSA's amendments to subsections (b)(1)(B) and (b)(1)(A) indicate Congress intended to restrict the applicability of mandatory life sentences to the most serious offenses. For example, for a conviction under subsection 841(b)(1)(A) sustained after two prior drug offenses, Congress reduced the mandatory minimum sentence from Life to 25 years. *See* FSA § 401(a)(2). The FSA also lowered the mandatory minimum sentence under subsection (b)(1)(A) for a conviction sustained after one prior drug offense from 20 years to 15 years. *Id.* Perhaps most critically, as discussed above, Congress restricted the types of prior convictions that would trigger a life sentence for those more serious offenses by replacing the expansive "felony drug offense" with the much narrower "serious drug felony." *Id.* at § 401(a)(1)-(2).

To be sure, Congress intended to punish those who committed drug offenses resulting in death or serious bodily injury severely. In 1986, Congress directed that all (b)(1)(A) – (b)(1)(C) convictions for drug trafficking resulting in death or serious bodily injury be punishable by a mandatory minimum of twenty years — and up to life — regardless of quantity. *See* Pub. L. No. 99-570, § 1002. Even after the FSA, that mandatory range remains unchanged. Nonetheless, it defies reason to believe that Congress intended this penalty to increase to mandatory life imprisonment only for (b)(1)(C) convictions where no prior "serious drug felony" was sustained.

## 2. The Imposition of the Mandatory Life Sentence under Subsection 841(b)(1)(C) Also Violates the Fifth Amendment Because it Results from an Arbitrary Sentencing Scheme with no Rational Basis.

Even if Congress had intended for an 841(b)(1)(C) conviction to mandate a life sentence on a defendant with a prior conviction for a "felony drug offense" that was not also a "serious drug felony," the imposition of the mandatory life sentence violates the constitutional rights to equal protection and due process of law. Congress "has the power to define criminal punishments without giving the courts any sentencing discretion." *Chapman v United States*, 500 U.S. 453, 467 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991). Congress' sentencing legislation, nonetheless, "'must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation.'" *Johnson v. Robinson*, 415 U.S. 361, 374, 94 S.Ct. 1160, 39 L.Ed.2d 389 (1974) (quoting *F.S. Royer Guano Co. v. Virginia*, 253 U.S. 412, 415, 40 S.Ct. 560, 64 L.Ed. 989 (1920)). The penalty scheme that was applied in the instant case has no rational basis and conflicts with the legitimate purpose of section 841.

Again, by failing to swap out "felony drug offense" for "serious drug felony" in 841(b)(1)(C), Congress created a scheme that punishes those who traffic in lesser quantities of drugs more harshly than those who traffic in greater quantities. Congress could have mandated that any section 841 conviction resulting in death or serious injury is sufficiently serious to warrant a mandatory life sentence if the

defendant had sustained a prior "felony drug offense." It did not do so.  Instead, it created, whether intentionally or not, a scheme that discriminates against defendants convicted of offenses involving lesser quantities of drugs while failing to further any legitimate government purpose.  Such a scheme clearly violates Due Process and Equal Protection.


## CONCLUSION

Based on the foregoing, Appellant Christopher Defilippis respectfully requests that this Honorable Court reverse the judgment and sentences imposed in this cause and remand the case to the district court with instructions to enter a judgment of acquittal on all counts or, in the alternative, an order for a new trial.

Respectfully Submitted,

s/ *Anne F. Borghetti*
ANNE F. BORGHETTI, ESQ.
12211 49th St. N., Ste 1
Clearwater, FL 33762-4300
Florida Bar # 0843385
Telephone:  727-502-0300
Facsimile:  727-502-0303
E-Mail: Anne@BorghettiLaw.com
CJA Counsel for Appellant

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a)</u>

The undersigned certifies, pursuant to 11th Cir. R. 28-1, that this Brief complies with the type-volume limitation of Federal Rule of Appellate Procedure because it contains 11,466 words, excluding the parts exempted by subsection 32(a)(7)(B)(iii). Microsoft Word software was used to count the words in the foregoing Brief. This Brief, likewise, complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point, Times New Roman font.

s/ *Anne F. Borghetti*
ANNE F. BORGHETTI, ESQ.
12211 49th St. N., Ste 1
Clearwater, FL 33762-4300
Florida Bar # 0843385
Telephone: 727-502-0300
Facsimile: 727-502-0303
E-Mail: Anne@BorghettiLaw.com
CJA Counsel for Appellant

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was filed using the CM/ECF system, which will send a notice of electronic filing to all counsel of record, on August 11, 2023.

s/ *Anne F. Borghetti*
ANNE F. BORGHETTI, ESQ.
12211 49th St. N., Ste 1
Clearwater, FL 33762-4300
Florida Bar # 0843385
Telephone: 727-502-0300
Facsimile: 727-502-0303
E-Mail: Anne@BorghettiLaw.com
CJA Counsel for Appellant

I FURTHER CERTIFY that four hard copies of the foregoing brief are being furnished to the Clerk of this Court by mail.

s/ *Anne F. Borghetti*
ANNE F. BORGHETTI, ESQ.
12211 49th St. N., Ste 1
Clearwater, FL 33762-4300
Florida Bar # 0843385
Telephone: 727-502-0300
Facsimile: 727-502-0303
E-Mail: Anne@BorghettiLaw.com
CJA Counsel for Appellant